**Ella Mae WELLS, et al., Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 87–5124.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 10, 1987.

Decided July 19, 1988.

Charles S. Siegel, Dallas, Tex., for appellants.

Gregory C. Sisk, Atty., Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., and Robert S. Greenspan, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellee.

Before ROBINSON and EDWARDS, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

Plaintiffs, 189 families composed of 571 persons who reside in the Dallas, Texas area, seek compensation for personal injuries and property damage which they and their minor children claim to have suffered due to alleged negligent acts and omissions of the Environmental Protection Agency ("EPA"). Plaintiffs claim that the EPA negligently regulated and communicated knowledge of public health risks and lead pollution dangers in plaintiffs' neighborhoods.[1] The district court granted the government's motion to dismiss, citing two exceptions to the Federal Tort Claims Act (the "Act"), 28 U.S.C. §§ 1346(b), 2671–2680, 2680(a) and 2680(h). *Wells v. United States of America,* 655 F.Supp. 715 (D.D.C. 1987). We affirm the district court's decision on the basis of the exception in the Act for discretionary functions and duties. 28 U.S.C. § 2680(a).

## I. FACTUAL BACKGROUND

Plaintiffs allege that for many years the EPA has continuously and gratuitously monitored and evaluated lead pollution levels in their neighborhoods that surround three lead smelters, RSR Corporation, Dixie Metals Corporation and N.L. Industries. One of the housing projects in which plaintiffs live, is "directly downwind from the largest lead recycling plant in the world." Brief for Appellants at 3. Plaintiffs contend that "[r]esultant brain damage and developmental impairments [from lead pollution] have produced lifelong debilitating effects ..." *id.* at 4, and that the EPA negligently violated an alleged legal duty to inform them of the risks and to adequately and timely remedy the hazards or to so require.

Plaintiffs also claim that the EPA affirmatively misled them as to the full extent of the lead pollution problem in that after the regional study was completed, Washington EPA headquarters deleted information from a press statement to mislead the public as to the extent of the lead contamination; that the EPA deleted all information indicating that elevated lead levels had been found in children's blood and in the soil around day care centers and school playgrounds; and that Dr. Norman Dyer, Chief of the EPA Pesticides and Toxics Branch, was discouraged from keeping any notes of his work on the regional lead study.

The district court found plaintiffs' claims barred by the misrepresentation exception of the Act which provides:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

... (h) Any claim arising out of ... misrepresentation, deceit ...

28 U.S.C. § 2680(h). *Wells,* 655 F.Supp. at 724. We need not determine the applicability of this misrepresentation exception, or whether the issue is preserved on appeal, because we find that the discretionary function exception applies and the government is immune from suit. Also, because of the application of the discretionary function exception, we need not determine whether the government would be liable as a private person under the good samaritan doctrine of Texas' tort law.

Finally, plaintiffs cursorily assert that the EPA violated the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.,* by failing to "require the submission by Texas of a 'lead implementation plan' for the Dallas area." Brief for Appellants at 7. Although plaintiffs do refer to the Clean Air Act claim in two sentences of their brief, *id.,* they make no factual or legal arguments in support thereof. Therefore we cannot address the issue.

Plaintiffs' claims primarily concentrate on the allegedly negligent decision of Dr. John Hernandez, the EPA Deputy Administrator for the area, to conduct further study while refusing to take immediate re-

---

1. The government contends that 95 of the 571 claims are barred under § 2675(a) of the Federal Tort Claims Act because the claimants did not file the required administrative claims with the EPA. Brief for Appellee at 6 n. 5. 28 U.S.C. §§ 1346(b), 2671–2680, 2675(a). The district court did not address this issue. *Wells,* 655 F.Supp. at 717 n. 2. We also find it unnecessary to reach this issue.

medial action or to accept an offer of one of the lead companies to clean up the area. After an EPA regional office conducted a study of lead in soil samples and school children's blood, RSR Corporation made a written offer to EPA to replace soil having lead concentrations of over 1000 parts per million. Dr. Hernandez decided, however, that further study was necessary in order to determine whether the study was necessary in order to determine whether the 1000 parts per million standard was an appropriate lead testing level for soil and did not accept the company's offer to clean up the area. In making the decision to further study the problem, he was motivated by his conclusion that if he accepted the company's offer he would implicitly be establishing a precedent that might be too stringent to be applied generally, even though there was evidence that some hazards existed at that level. Dr. Hernandez decided that eighteen months of additional blood testing should be conducted. *Wells*, 655 F.Supp. at 718. RSR Corporation subsequently voluntarily cleaned up the area.

## II. ANALYSIS

### A. *Applicable Standard*

The district court granted the government's motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(1), 12(b)(6). In order to survive a motion to dismiss, "the complaint must set forth sufficient information to suggest that there exists *some* recognized legal theory upon which relief can be granted." *Gregg v. Barrett*, 771 F.2d 539, 547 (D.C.Cir.1985), quoting *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1081 (D.C.Cir. 1984). Plaintiffs emphasize that they need only "adduce a set of facts" supporting their legal claims in order to survive a motion to dismiss. Brief for Appellants at 1. *See also id.* at 14; Reply Brief for Appellants at 13–15, 18–19. Assuming all factual allegations are true, a court must dismiss a complaint if the plaintiff fails to establish a right to relief based on the facts

alleged in the complaint. *Gregg*, 771 F.2d at 547.

### B. *The Private Liability Requirement of the Tort Claims Act*

At the outset the government relies upon the private liability requirement that derives from section 1346(b) of Title 28. This provides that federal courts have jurisdiction over actions involving claims against the United States for

the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). The Tort Claims Act further provides that the government shall be liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

■ We reject the government's argument that, as a threshold matter, the Act does not apply when the government is engaged in a "core governmental function." Brief for Appellee at 23. Very few decisions even mention the Act's private liability requirement and we have found no decisions that rely solely on such requirement or any "core governmental function" doctrine in holding the government immune from suit. *See United States v. Muniz*, 374 U.S. 150, 153, 83 S.Ct. 1850, 1853, 10 L.Ed.2d 805 (1962) ("Whether a claim could be made out would depend upon whether a private individual under like circumstances would be liable under state law ..."); *Rayonier, Inc. v. United States*, 352 U.S. 315, 319, 77 S.Ct. 374, 376, 1 L.Ed.2d 354 (1957) ("the test ... is whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred."); *Arvanis v. Noslo Engineering Consultants, Inc.*, 739 F.2d 1287, 1292 (7th Cir.1984) ("In the absence of any persuasive analogy with private conduct, we conclude that appellants cannot maintain a Tort Claims action against the United States."); *Gelley v. Astra Pharmaceutical*

*Products, Inc.*, 466 F.Supp. 182, 185 (D.Minn.1979) ("Regulatory activity engaged in by FDA personnel simply has no counterpart in private activity and thus cannot give rise to liability ..."), *aff'd*, 610 F.2d 558, 563 (8th Cir.1979). Most cases simply quote the private liability requirement of section 1346(b) and then proceed to rely upon the Act's discretionary function exception. *See, e.g., United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2761, 81 L.Ed.2d 660 (1984). The Supreme Court recently rejected the government's core governmental function argument in *Berkovitz v. United States*, —— U.S. ——, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). Justice Marshall, writing for a unanimous Court, commented that the government's core governmental function argument "appears to replicate precisely the position expressly rejected" in *Indian Towing Co. v. United States*, 350 U.S. 61, 64–65, 76 S.Ct. 122, 124–125, 100 L.Ed. 48 (1955), and *Rayonier, Inc. v. United States*, 352 U.S. 315, 318–19, 77 S.Ct. 374, 376–77, 1 L.Ed.2d 354 (1957). *Berkovitz*, —— U.S. at —— n. 5, 108 S.Ct. at 1960 n. 5. Furthermore, as set forth in the margin, courts have imposed liability on the United States in many situations in which the government was engaged in activities that have no analogy in the private sector.[2]

The district court concluded that the private liability requirement "merely establishes the foundation for" and is "largely congruent with" the discretionary function exception to the Act, and therefore the court did not consider the private liability requirement separately. 665 F.Supp. at 719. The government argues that the private liability requirement is both "a logical prerequisite" to a consideration of the Act's exceptions and "an independent basis upon which to affirm the district court's dismissal in this case." Brief for Appellee at 15 n. 9. However, there are very few decisions that even discuss the private liability requirement, *see supra* note 2, and we have found *none* that rely solely on it to hold the government immune from suit. Therefore, we reject the government's reliance on the private liability requirement. Instead we rely solely upon the discretionary function or duty exception, *infra.*

C. *The Tort Claims Act and the Discretionary Function Exception*

1. *The Purpose of the Discretionary Function Exception*

The Federal Tort Claims Act, 28 U.S.C., Chapter 171, §§ 2674–2680 provides:

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual

---

**2.** This court has "imposed liability upon the United States for its performance of activities that are not usually performed by private persons." *Canadian Transport Co. v. United States*, 663 F.2d 1081, 1090 (D.C.Cir.1980). In *Canadian Transport*, we held the government subject to suit in a case in which the Coast Guard refused to permit a Polish vessel to enter a United States port with naval installations on grounds of national security. Six years later in *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187 (D.C.Cir.1986), this court held that the government was not protected from certain claims in a case in which an Indian tribe sought compensation for property damage allegedly due to the negligence of an FBI agent in ordering law enforcement personnel to withdraw from a hostage situation on an Indian reservation. *See also Black v. Sheraton Corp. of America*, 564 F.2d 531 (D.C.Cir.1977) (former lobbyist's action seeking compensation for injuries allegedly sustained due to concededly illegal eavesdropping by FBI is not barred under the

Federal Tort Claims Act). In *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), the Supreme Court held the government liable under the Act in a suit for damages allegedly caused by the Coast Guard's negligent operation of a light house. The Court rejected the government's contention that the Act "must be read as excluding liability in the performance of activities which private persons do not perform ..." *Indian Towing*, 350 U.S. at 64, 76 S.Ct. at 124, and concluded that "we would be attributing bizarre motives to Congress were we to hold that it was predicating liability on such a completely fortuitous circumstance—the presence or absence of identical private activity." *Id.* at 67, 76 S.Ct. at 125. Furthermore, contrary to the government's assertion, Brief for Appellee at 22–24, courts have not examined whether the activity that caused the harm was the direct responsibility of the government, or was merely subject to the government's regulation. *See infra* note 3.

under like circumstances ... [but the] provisions of this chapter and section 1346(b) [the jurisdictional statute] ... shall not apply to—

> Any claim ... based upon the exercise or performance or the failure to exercise or perform a *discretionary function or duty* on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. §§ 2674, 2680(a) (emphasis added). The effect of this provision of the Act is to waive the government's sovereign immunity for certain kinds of tort liability, but then create an exception to this waiver by excluding the government from any liability where the claim is based upon "the exercise or performance or the failure to exercise or perform a discretionary function or duty ..." *Id.*

In the leading case interpreting this provision of the Act, the Supreme Court explained: "[I]t was not contemplated that the Government should be subject to liability arising from acts of a governmental nature or function.... Uppermost in the collective mind of Congress [in waiving immunity] were the ordinary commonlaw torts. Of these, the example which is reiterated in the course of the repeated proposals for submitting the United States to tort liability is 'negligence in the operation of vehicles.'" *Dalehite v. United States,* 346 U.S. 15, 28, 73 S.Ct. 956, 964, 97 L.Ed. 1427 (1953), quoting numerous references in legislative history. *Dalehite* involved large damage claims against the United States arising out of a disastrous explosion of a ship carrying ammonium nitrate fertilizer, that had been produced and distributed under the direction of the United States. The Court concluded that the action was barred by § 2680(a), *supra,* because the allegedly negligent act involved governmental discretion "to act according to one's judgment of the best course" to follow with respect to the program generally and the handling of

its product. *Dalehite,* 346 U.S. at 34, 73 S.Ct. at 967. The Court commented that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. 346 U.S. at 35–36, 73 S.Ct. at 968. *Dalehite* also incorporated an extract from the House Report on the bill which stated:

> [The exemption was] also designed to preclude application of the bill [Act] to a claim against a regulatory agency ... based upon an alleged abuse of discretionary authority by an officer or employee, whether or not negligence is alleged to have been involved.

346 U.S. at 29, n. 21, 73 S.Ct. at 964, n. 21.

More recently the Supreme Court in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), pointed to the intent of Congress in enacting the statute and its legislative history. *Varig Airlines* involved tort actions by an airline and victims of an airplane accident who alleged that the Federal Aviation Administration ("FAA") was negligent in certifying the airline because its trash receptacles did not satisfy safety regulations. The *Varig Airlines* Court unanimously held that the FAA's certification process was immune under the discretionary function or duty exception, concluding that "it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case." *Id.* at 813, 104 S.Ct. at 2764. With respect to congressional intent the Court stated that the exception "plainly was intended to encompass the discretionary acts of the Government acting in its role as a regulator of the conduct of private individuals," *id.* at 813–14, 104 S.Ct. at 2764 [3] and concluded that

---

**3.** The government relies partially on this language from *Varig Airlines* in arguing that the "discretionary function exception presumptively applies to the Government when acting in its

capacity as a regulator of individual conduct." Brief for Appellees at 31. Courts have unanimously rejected this position. *See, e.g. Collins v. United States,* 783 F.2d 1225, 1229 (5th Cir.1986)

Congress' emphasis on protecting regulatory activities suggests an underlying basis for the exception, i.e.: "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in *social, economic,* and *political policy* through the medium of an action in tort." *Id.* at 814, 104 S.Ct. at 2765 (emphasis added). The Supreme Court in *Berkovitz* also reaffirmed its interpretation that Congress' purpose in enacting the exception was "to prevent '[j]udicial intervention in ... the political, social, and economic judgments' of governmental—including regulatory—agencies." *Berkovitz v. United States,* —— U.S. ——, ——, 108 S.Ct. 1954, 1960, 100 L.Ed.2d 531 (1988), quoting *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. at 2765.

Other subsequent decisions have echoed *Varig Airlines'* concern about judicial second guessing of agency decision making. In *Cisco v. United States,* 768 F.2d 788, 789 (7th Cir.1985), the Seventh Circuit ruled that "Congress has left to the EPA to decide the manner in which, and the extent to which, it will protect individuals and their property from exposure to hazardous wastes." The facts in *Cisco* are almost parallel to those here. Members of several households in *Cisco* sued the EPA claiming that it "was negligent in failing to warn [them] ... that dirt contaminated by [hazardous dioxin] ... had been used as residential landfill, negligent in failing to require that the contaminated dirt be removed, and negligent in failing to protect the households from exposure to the toxin." *Id.* The court relying primarily upon *Varig Airlines,* dismissed the action on the ground that the discretionary exception of the statute applied, and held:

> When an agency makes decisions regarding the supervision of private individuals,
>
> it is exercising discretionary regulatory authority of the most basic kind. Decisions as to the manner of enforc-

ing regulations directly affect the feasibility and practicality of the Government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding.... Judicial intervention in such decisionmaking through private tort suits would require the courts to "second-guess" the *political, social, and economic* judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent.

*Cisco,* 768 F.2d at 789, quoting *Varig Airlines,* 467 U.S. at 820, 104 S.Ct. at 2767–68 (emphasis added).

In *Gray v. Bell,* 712 F.2d 490 (D.C.Cir. 1983), former FBI Acting Director Gray sued the United States claiming that the Justice Department's investigations of him were negligent. This court held that the United States was immune from suit under the discretionary function exception. We noted that the most important modern policy basis for sovereign immunity is that under "principles of separation of powers, courts should refrain from reviewing or judging the propriety of the policymaking acts of coordinate branches." *Gray,* 712 F.2d at 511. *See also Sami v. United States,* 617 F.2d 755, 766–67 (D.C.Cir.1979) ("[T]he policy of the [discretionary] exception was to 'prevent[ ] tort actions from becoming a vehicle for judicial interference with decisionmaking that is properly exercised by other branches of the government' ...'" quoting *Blessing v. United States,* 447 F.Supp. 1160, 1170 (E.D.Pa.1978)).

### 2. *Application of the Discretionary Function Exception to This Case*

■ Plaintiffs argue that Dr. Hernandez's decision was based only upon scien-

("We reject the government's argument that *Varig* exempts the United States from liability whenever challenged conduct is regulatory in nature. Neither the language nor the structure of the decision in *Varig* supports such a view."). *Berkovitz v. United States,* —— U.S. ——, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), further noted

that "[i]n restating and clarifying the scope of the discretionary function exception, we intend to specifically reject the Government's argument ... that the exception precludes liability for any and all acts arising out of the regulatory programs of federal agencies." *Berkovitz,* —— U.S. at ——; 108 S.Ct. at 1959–60.

tific considerations, and therefore that it does not fall within the discretionary function exception. Brief for Appellants at 14–20; Reply Brief at 13–19. Both sides point to congressional hearings ("Hearings") transcripts to support their arguments.[4] On this issue we find that Dr. Hernandez's decision to order further study was based on economic, social and political policy considerations, and not solely on scientific considerations as plaintiffs claim. The discretionary function exception precludes liability in this case because Dr. Hernandez was exercising permissible discretion based on policy considerations in deciding to order further study. In *Berkovitz v. United States, supra*, it was held that the government was not insulated from suit by the discretionary function exception. The Court explained that since plaintiff's claim alleged that the government violated mandatory directives, the government had no discretion, and therefore the discretionary exception could not apply. The unanimous opinion emphasized that the exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz*, —— U.S. at ——, 108 S.Ct. at 1959. *Berkovitz* distinguished cases, such as the present one, in which "the policies and programs formulated by the [government] allow room for implementing officials to make independent policy judgments...." *Id.* at —— – ——, 108 S.Ct. at 1964. In cases which involve policy judgment and discretion, such as this one, "the discretionary function exception protects the acts taken by those officials in the exercise of this discretion." *Id.* at ——, 108 S.Ct. at 1964.

In the agency Hearings here there are two examples of economic considerations that Dr. Hernandez took into account in making his decision. *See* Hearings at 62 (J.A. 105) (Dr. Hernandez quoted as saying that EPA was proposing approaches to the lead contamination issue "that will be within the context of practicality of our budgetary restraints."); Hearings at 320 (J.A. 132) (Frances Phillips, EPA Deputy Regional Administrator, states that Dr. Hernandez told her "that he did not think we should spend any money to remove dirt or have any bulldozers start up until we could identify a specific health problem relative to this case.").

The following statements in the Hearings support the conclusion that Dr. Hernandez also took social and political factors into account in reaching his decision. *See* Hearings at 66 (J.A. at 109) (Dr. Hernandez explains: "Supposing that we had, the first day that report turned up, said 'Let's go and take that playground and clean that place up, and they do this, and say "Done" and get a settlement out of it,' and then we would have been charged with a 'sweetheart' deal with somebody, done in the dark of night, before we had done any kind of further study, when in fact, we found that this study showed problems further out."); Hearings at 67 (J.A. 110) (Dr. Hernandez states that "moving ahead without some kind of information as to the nature of the source, the mode of travel, the kinds of control techniques that might otherwise be used, would leave us open to the same kinds of criticisms, 'Why did you do that?' "); Hearings at 317 (J.A. 129) (Mrs. Phillips states that "Dr. Hernandez was concerned about the precedent that cleaning up at an action level of over a 1,000 parts per million would set, not only in the Dallas area, but relative to all the urban areas and lead smelter areas across the country."); Hearings at 335 (J.A. 147) (Mrs. Phillips and Dr. Hernandez discussed, among other factors, "a primary concern for the children" and "the effect this had on other Federal court cases in the region ... and how this could affect our negotiations.").[5]

---

4. *Hazardous Waste Contamination of Water Resources (EPA Implementation of the Superfund Program and Lead Pollution Problems in Dallas, TX): Hearings Before the House Subcommittee on Investigations and Oversight of the House Committee on Public Works and Transportation,* 98th Cong., 1st Sess. (1983).

5. Plaintiffs primarily rely on two exchanges that took place at the Hearings to support their view that Dr. Hernandez relied only upon medical factors. The first of such exchanges is Dr. Hernandez's statement: "You know, if you said, 'I want to change your mind about using good information, about collecting the best informa-

## II. CONCLUSION

Even though plaintiffs need only "adduce a set of facts," Brief for Appellants at 1, supporting their legal claims in order to survive a motion to dismiss, *Gregg v. Barrett*, 771 F.2d 539, 547 (D.C.Cir.1985), the government must prevail in this case. Since Dr. Hernandez's decision ordering further study involved "social, economic and political policy" considerations, *Berkovitz*, —— U.S. ——, ——, 108 S.Ct. 1954, 1960, quoting *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. at 2765, it is protected by the discretionary function exception. Therefore the government is immune from suit.[6]

We affirm the dismissal of the complaint because even assuming that all of its factual allegations are true, plaintiffs have failed to establish a right to relief. We are therefore without jurisdiction.

*Judgment accordingly.*

---

tion, about looking at exposures,' you know, risks to human health are based on two things—one, the presence of a toxic material whose risk we analyze; and the second one is the exposure and the exposure route that you have. And it is through those two processes, neither one independent of the other, that we make our decisions." Hearings at 67 (J.A. 110). This quote cannot be taken out of context. In context it does not support plaintiffs' argument because Dr. Hernandez's further comments show that he considered many nonscientific factors. Furthermore, the quote does not state that he did not consider other factors besides the two he mentioned.

The second exchange plaintiffs rely on derives from testimony of four of Dr. Hernandez's subordinates. Congressman Snyder inquired of them whether they had "any reason to believe that any actions on his (Dr. Hernandez) part were based upon anything other than his scientific judgment." Hearings at 339 (J.A. 151). They each replied that they did not. *Id.* Plaintiffs also take these statements out of context. Congressman Snyder was actually questioning the four subordinates to determine whether they knew of any "unholy alliance between Dr. Hernandez and any of the three companies" that could have influenced his decision. *Id.* They did not.

**6.** The plaintiffs and the government disagree on which aspect of the EPA's actions this court should examine to determine whether the discretionary function exception applies. Plaintiffs want the court to focus on Dr. Hernandez's decision to conduct further study of lead pollution levels. Reply Brief for Appellants at 11. The government contends that the court should instead concentrate its analysis on "the overall discretionary activity at issue, the formulation of policy standards for dealing with a particular environmental problem." Brief for Appellees at 32.

The government cites two cases to support its view that it is improper for a court to "compart-

mentalize one aspect of a discretionary regulatory program and determine its policy implications in isolation." Brief for Appellants at 32–33. Neither case supports the government's argument. In *Smith v. Johns–Manville Corp.*, 795 F.2d 301 (3d Cir.1986), asbestos suppliers sued the United States for indemnity and contribution for employees' injuries. The court held that the General Services Administration's decision to sell asbestos "as is" fell within the exception. The court disagreed with the defendants' view that the court should isolate the agency's decision not to use warning labels from the rest of the program. *Smith*, 795 F.2d at 308. The basis for the decision in *Smith* is distinguishable from the basis that is applicable here. *Smith* emphasized that *Dalehite* bars suits when administrators act in conformance with official directions. *Id.* In this case, Dr. Hernandez, as EPA Deputy Administrator, was formulating policy, not following official directions.

The government also cites *Gray v. Bell, supra,* to support its position. The court found the government immune under the exception, holding that the "tortious actions allegedly undertaken by the defendants are too intertwined with purely discretionary decisions...." *Gray*, 712 F.2d at 515–16. *Gray* limited its holding to the facts presented. *Id.* at 516. The government argues that, as in *Gray*, it is impossible to consider "an isolated decision to conduct further study of a pollution hazard ... apart from the broad regulatory process of developing a standard to apply." Brief for Appellants at 34. Dr. Hernandez's decision is not too "intertwined" with the overall regulatory process for this court to examine it. Dr. Hernandez was in charge of formulating policies to deal with the lead problem in Dallas. His decision to order further study of the lead situation is a distinct aspect of the overall policy formulation not to participate in a private cleanup that could implicitly sanction an unproven standard and arguably establish a controlling precedent as to a level of pollution requiring government action.