David DUSOE and Joan
Dusoe, Plaintiffs

v.

MOBIL OIL CORPORATION,
Defendant.

No. CIV. A. 99–40112–NMG.

United States District Court,
D. Massachusetts.

Sept. 21, 2001.

Raymonds J. Reed, Reed & Reed, Worcester, MA, for Plaintiffs.

Donald R. Frederico, Terry L. Wood, McDermott, Will & Emory, Boston, MA, Emily E. Smith–Lee, McDermott, Will & Emery, Boston, MA, Deborah E. Barnard, Ralph T. Lepore, III, Holland & Knight LLP, Boston, MA, for Defendant.

### MEMORANDUM & ORDER

GORTON, District Judge.

### I. *Summary*

On May 14, 1999, plaintiffs David Dusoe and Joan Dusoe ("the Dusoes" or "the plaintiffs") filed a complaint in Worcester Superior Court for personal injuries and property damages arising out of a release of gasoline on December 20, 1968 ("the 1968 release") from a pipeline in Oxford, Massachusetts belonging to defendant Mobil Oil Corporation ("Mobil"). The plaintiffs have resided at *64* Joe Jenny Road since 1992. The Mobil pipeline is located approximately one thousand (1,000) feet east of the plaintiffs' property.

The complaint contends that Mobil did not clean up the 1968 release of approximately 27,000 gallons of petroleum product and that the release contaminated the plaintiffs' property and its underground water supply. As a result of the 1968 release, the plaintiffs allege that their property has lost value and that they have been personally injured from ingesting and dermally absorbing the contaminated well water and from inhaling air contaminated from vaporization of the released product.

The complaint asserts claims for negligence, trespass, nuisance, violation of M.G.L. c. 21E, § 5, strict liability and negligent and intentional infliction of emotional distress. On June 15, 1999, Mobil filed a notice of removal to this Court on the basis of diversity jurisdiction. At all times relevant to the action, Mobil states that the plaintiffs were residents of Massachusetts and that Mobil, a New York corporation, has its principal place of business in Fairfax, Virginia.

Currently pending before this Court are motions by Mobil (1) for Summary Judgment, (2) to Strike Materials Submitted in Plaintiffs' Opposition to Mobil's Motion for Summary Judgment and (3) to Exclude Expert Testimony.

## II. Mobil's Motion for Summary Judgment (Docket No. 19)

Mobil moves, pursuant to Fed.R.Civ.P. 56, for summary judgment in its favor on all the plaintiffs' claims. Mobil contends that there is no evidence that the plaintiffs' water supply or soil have ever been contaminated and that such evidence is essential to each of the plaintiffs' claims.

### A. Standard of Review

In accord with Fed.R.Civ.P. 56(c), summary judgment must be granted if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *See* Fed. R.Civ.P. 56(c); *Magee v. United States,* 121 F.3d 1, 3 (1st Cir.1997). A genuine issue is one which a reasonable fact finder could resolve in favor of the nonmoving party. *Id.* Not every genuine factual conflict, however, necessitates a trial. "It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." *Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 448 (1st Cir.1997) (internal quotations omitted).

Once the moving party has demonstrated that no genuine issue of material fact exists, the burden of production shifts to the nonmovant to contradict the demonstration by coming "forward with specific provable facts which establish that there is a triable issue." *Matos v. Davila,* 135 F.3d 182, 185 (1st Cir.1998). The role of a summary judgment motion in general "is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Coyne v. Taber Partners I,* 53 F.3d 454, 457 (1st Cir.1995).

### B. Factual Background

The primary chemical constituents of gasoline are known as benzene, toluene, ethylbenzene and xylenes ("BTEX"). A method for testing water samples used in tests conducted in the current litigation can detect BTEX constituents at levels as low as 0.5 parts per billion. That is, if a water sample contained 0.5 parts per billion ("ppb") of benzene, for every one billion grams of water in the source from which the sample was taken, there would be one half of a gram of benzene. If no benzene was detected in the sample, the laboratory report would reflect an "ND" or "Non–Detect" result. Such a result would indicate that no contamination was present

in the sample or that the contaminant was present at a concentration of less than the level of detection, in this case, 0.5 parts per billion. The Massachusetts drinking water standard for benzene requires less than 5 ppb.

On April 26, 1996, in response to complaints to the Massachusetts Department of Environmental Protection ("DEP") of a strange odor in the drinking water at *58* Joe Jenny Road, Oxford, Massachusetts, the drinking water well for that property was tested and the sample revealed the presence of BTEX constituents ranging from 30.3 ppb of benzene, 2.7 ppb of toluene, 2.1 ppb of ethylbenzene and 2.4 ppb of xylene. On April 29, 1996, a test of samples at that same site revealed the presence of benzene at 56.8 to 60.6 ppb and ethylbenzene at 6.3 to 6.4 ppb.

As a result of those tests, the DEP and the Oxford Board of Health conducted an investigation of the area. No signs of stressed vegetation or other indications of a release were observed. A survey of the area indicated that it was all residential, or undeveloped and heavily wooded, and that no known uses or other businesses associated with large volumes of petroleum, other than the Mobil pipeline, existed within a mile radius of the contaminated well at 58 Joe Jenny Road.

Because the Mobil pipeline was the potential source for this contamination, the DEP contacted Mobil's office of U.S. Supply and Logistics in Riverside, Rhode Island in May, 1996. Mobil verified that no current sudden releases were occurring from the pipeline at that time. When questioned regarding any past releases, the Mobil representative stated he knew of none.

Between April and June of 1996, bedrock drinking water wells of ten other residents within a quarter of a mile of 58 Joe Jenny Road were sampled. Of those, only one property, at *60* Joe Jenny Road, showed any sign of contamination (11.0 ppb of benzene).

Soil samples were eventually taken of *58* Joe Jenny Road and revealed no benzene and very low levels of toluene (1.5 ppb), ethylbenzene (1.6 ppb) and xylene (2.6 to 9.0 ppb). The DEP determined that this contamination was the result of contaminated groundwater being pumped to the surface as part of normal well development and should not be viewed as the source of the contamination of the private well. No other indication of an on-site source of contamination was found on that property.

In June, 1997, the DEP was contacted by a former area resident and by a Town of Oxford employee with information regarding the sudden release of petroleum from the Mobil pipeline in the area of Joe Jenny Road. According to their statements, such a release likely did occur in the late 1960s or early 1970s.

Based on that information, in July, 1997, the DEP issued Mobil a Request for Information regarding the section of the pipeline within a one mile radius of the contaminated wells. On September, 12, 1997 Mobil confirmed that it was the owner of the subject pipeline and that on December 20, 1968, approximately 27,000 gallons of gasoline were released from a hole in that pipeline caused by excess pressure. On September 26, 1997, the DEP issued a Notice of Responsibility ("N.O.R.") to Mobil with respect to the private well contamination in the area. That N.O.R. states that there was no indication, subsequent to the 1968 release, that any of the released gasoline was recovered or that Mobil conducted any environmental cleanup actions.

In late 1997, the water well located at *66* Joe Jenny Road was tested for petroleum contaminants. That test revealed the presence of 1.3 ppb of methyl tertiary-

butyl ether ("MTBE"). MTBE is a gasoline additive that enhances octane and was first utilized in gasoline in the 1980s. Undated test results of *58* and *60* Joe Jenny Road revealed MTBE levels of 0.7 and 38 ug/l (micrograms per liter), respectively.[1]

According to a 1997 Fact Sheet issued by the United States Environmental Protection Agency entitled "Drinking Water Advisory: Consumer Acceptability Advice and Health Effects Analysis on [MTBE]" ("the Fact Sheet"), there is no data on the effects on humans of drinking MTBE-contaminated water and based on the limited sampling available at the time, "most concentrations at which MTBE has been found in drinking water sources are unlikely to cause adverse health effects." However, the Fact Sheet points out that MTBE has a very unpleasant taste and odor and can make contaminated drinking water unacceptable to the public when MTBE levels of 20–40 ug/l are exceeded. According to a January 26, 1998 letter from a Mobil Environmental Project Manager to the resident at *66* Joe Jenny Road (included as an exhibit to one of the plaintiffs' affidavits), the Massachusetts drinking water standard for MTBE was 70 ppb.

In January, 2000, the Massachusetts Department of Public Health ("DPH"), under cooperative agreement with the Agency for Toxic Substances Disease Registry ("ATSDR"), completed a Health Consultation for the Joe Jenny Road neighborhood ("the DPH Report"). The DPH concluded that the maximum possible exposures for those residents who had *actual* contamination in their wells was not expected to result in adverse health effect. *See* Mobil's Memorandum in Support of Motion for Summary Judgment, Exhibit 4, The DPH Report and Cover Letter. The DPH Report did note that

[D]ue to the limited amount of sampling data...and incomplete groundwater characterization, there is some uncertainty as to the levels of contaminants present in the groundwater prior to 1996, and, therefore, it is not possible to make definitive estimates of exposures prior to that time.

*Id.*

On September 28, 2000, Roux Associates, Inc. ("Roux") submitted an Immediate Response Action Status Report ("the Roux Report") to the DEP on behalf of Mobil outlining the various activities undertaken by Mobil from February 29 through August 31, 2000, to deal with the contamination. The Roux Report indicates, among other things, that evidence of dumping was observed throughout the area of the Joe Jenny Road neighborhood, including random rusting metal debris such as old bedsprings. However, the only evidence of dumping of hazardous materials, including several rusty cans of paint and plastic, quart-size oil containers, were observed along the east side of Joe Jenny Road, approximately 450 feet south of the plaintiffs' property at 64 Joe Jenny Road.

Finally, the Roux Report provides a map, at Plate 10 ("the Roux Map"), outlining the maximum projected limits of potentially impacted groundwater resulting from the 1968 release. Plate 10 indicates that a portion of the southern border of maximum projected contamination outline runs, east to west, through the middle of the plaintiffs' property. Plate 10 also reveals the absence of detections of petroleum hydrocarbons in domestic wells located on

---

1. The MTBE data discussed by the parties in their briefs describes amounts in terms of micrograms per liter, as compared to the measure of BTEX constituents, parts per billion. The Court is led to believe that the two measurements are identical.

both the plaintiffs' property and an adjacent property located to the east.

### 1. The Plaintiffs' Property

According to Mobil's expert witness, Thomas Nunno ("Nunno"), eleven samples of water from the Dusoe residence collected between November, 1997 and the present date have been analyzed by an EPA method for drinking water, which includes testing for BTEX.[2]

Nunno's affidavit reveals that all eleven of the water samples taken from the Dusoes' well resulted in "Non–Detects" for BTEX. Based on those results, Nunno contends that there is no basis to conclude that the Dusoes' well has ever been contaminated as a result of a release of gasoline from Mobil's pipeline. Moreover, he avers that as a result of soil gas surveys and soil sampling of neighboring properties, there is no basis to conclude that any soil on the Dusoes' property has been contaminated as a result of the 1968 release. Finally, Nunno states that an analysis of bedrock fractures through which groundwater of the Joe Jenny Road neighborhood travels reveals that in his opinion to a reasonable degree of scientific certainty, there is no basis to conclude that the Dusoes' well is likely to become contaminated in the future as a result of the 1968 release.[3]

Similarly, according to one of the plaintiffs' expert witnesses, Richard Kowalski ("Kowalski"), there have been no gasoline constituents detected in the well on the Dusoes' property.[4] At his deposition, Kowalski maintains that he is unable to form an opinion to a reasonable degree of certainty as to whether the Dusoes' well is likely to become contaminated in the future.

Kowalski contests the veracity of Nunno's statements that the soil samples taken from nearby properties confirmed the absence of surficial soil contamination. He points out that seven of the soil samples were of a lesser weight than the fifteen (15) grams +/25% desired to perform the analysis. The affidavit omits the weight actually submitted by the allegedly inadequate samples, and the briefs do not indicate the total number of soil samples tested.

Finally, Kowalski maintains that although he is unwilling to state at a 90% confidence level that the Mobil pipeline is the source of MTBE in the Joe Jenny neighborhood, he opines that it is more probable than not that the Mobil pipeline is the source for the MTBE detected in that neighborhood as a result of releases sometime after 1980.

### 2. Plaintiffs' Alleged Personal Injuries

Mrs. Dusoe claims to suffer from "autonomic nervous system dysfunction" result-

**2.** Nunno is a Licensed Site Professional in the Commonwealth of Massachusetts, with a B.S. in civil engineering and a M.S. in environmental engineering.

**3.** The statements and opinions in Nunno's affidavit are unrebutted by the evidence submitted by the plaintiffs.

**4.** Kowalski is a certified professional geologist and a Licensed Site Professional in the Commonwealth of Massachusetts whose affidavits Mobil seeks to strike on the grounds that (1) the plaintiffs have not served a report by Kowalski as required by Fed.R.Civ.P. 26(a)(2)(B), (2) his opinions contradict his earlier sworn deposition testimony and (3) his opinions fail to satisfy the requirements of Fed.R.Evid. 702 or the United States Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Notwithstanding those objections, Kowalski's affidavits and opinions have been considered in connection with Mobil's Motion for Summary Judgment.

ing from exposure to chemicals. Her physical symptoms include headaches, nausea, muscle weakness, cramps and spasms, constipation, vision changes and bladder complications. Mrs. Dusoe understands that autonomic nervous system dysfunction has similar symptoms to multiple sclerosis. However, despite her primary care physician's recommendation that she be evaluated for multiple sclerosis, she declined such a workup on the grounds that she stopped feeling sick in early 1996 and wanted to finish school and increase her life insurance before she had a diagnosis such as multiple sclerosis or autonomic nervous system dysfunction on her records.

Both Mr. and Mrs. Dusoe also claim emotional distress as a result of the contamination described above. Mr. Dusoe states that he suffers from "depression and stress" while Mrs. Dusoe maintains she suffers from anxiety attacks and stress. At her deposition, Mrs. Dusoe allegedly suffered her first anxiety attack in 1990, six years before learning about the possibility of contamination in the Joe Jenny Road neighborhood and two years prior to living in that neighborhood. She also stated that all of her anxiety attacks since then have been associated with competitive sports or some kind of competitive situation. Neither of the Dusoes has sought treatment or counseling for emotional distress.

## C. Discussion

### 1. Negligence

■ A negligence action may not be maintained unless one has suffered injury or damage that is causally connected to a breach of duty. *Cannon v. Sears, Roebuck & Co.*, 374 Mass. 739, 742, 374 N.E.2d 582 (1978), *citing Sullivan v. Old Colony St. Ry.*, 200 Mass. 303, 308, 86 N.E. 511 (1908).

■ In this case, with respect to the claim of contamination of their property, the Dusoes have failed to present any evidence of actual contamination. *See Kempinski v. Massachusetts Turnpike Authority*, 2000 WL 420742, *3, 2000 Mass.Super. LEXIS 66, *10 (Mass.Super.2000) ("Evidence of...property damage is...required for a negligence claim."). All eleven of the water samples taken from the Dusoes' well resulted in "Non–Detects" for BTEX and based on those results, Thomas Nunno, Mobil's expert, contends that there is *no* basis to conclude that the Dusoes' well has ever been contaminated as a result of a release of gasoline from Mobil's pipeline. Nunno also avers that as a result of soil gas surveys and soil sampling of neighboring properties, there is *no* basis to conclude that any soil on the Dusoes' property has been contaminated as a result of the 1968 release.

The plaintiffs' expert, Richard Kowalski, does not dispute those findings but instead attacks the methodology of the soil samples by pointing out that seven of the soil samples were of a lesser weight than the weight desired to perform the analysis. He does not indicate the weight actually submitted by the inadequate samples nor state the total number of soil samples tested. The plaintiffs appear to have made no attempt to conduct independent testing of the soil either on their own property or on neighboring properties.

The Dusoes place great weight on the fact that the Roux Map indicates that "the plume" of contamination identified includes portions of the Dusoes' property.[5] However-

---

5. The term "plume" is employed by the plaintiffs and this Court has been unable to dis-

cern, from the briefs before it, whether it has any special scientific meaning. Therefore,

er, the Roux Map outlines the *maximum* projected limits of potentially impacted groundwater resulting from the 1968 release. Numerous samples of the plaintiffs' well water, along with samples of an adjacent property to the east, revealed the absence, in detectible quantities, of BTEX contaminants. As such, the record before this Court does not establish any contamination of the plaintiffs' land or well water.

■ Additionally, assuming that the Dusoes could establish that Mobil breached a duty of care owed to them in 1968, decades before they moved to Joe Jenny Road, there is no evidence that their personal injuries are causally connected to the 1968 release. The plaintiffs have not established actual exposure to contaminants from the 1968 release. The record could not reasonably support a finding that the Dusoes have been exposed to any contamination or a finding that their alleged physical symptoms are causally related to BTEX contaminants. The record provides no evidence that Mrs. Dusoe has been evaluated by a toxicologist in environmental medicine or diagnosed with autonomic nervous system dysfunction. Additionally, the possibility that her symptoms are caused by multiple sclerosis has not been ruled out because she has refused to get a workup regarding that disease.

To the extent that the plaintiffs rely on the Roux Map as evidence of a link between the plaintiffs' injuries and the 1968 release, as stated before, the Roux Map outlines the *maximum* projected limits of potentially impacted groundwater resulting from the 1968 release. Numerous samples reveal the absence of detectible quantities of BTEX contaminants in the plaintiffs' well. Therefore, the connection between Mrs. Dusoe's symptoms and the Mobil release is simply too tenuous to

warrant a conclusion by any reasonable jury that her personal injuries resulted from any assumed breach of duty by Mobil.

Moreover, Kowalski's hedging opinions regarding the source of MTBE found in neighboring wells serves only as a red herring in this case. According to the 1997 Fact Sheet on MTBE issued by the United States Environmental Protection Agency, the primary problem of MTBE is not related to adverse health effects but the unsuitability, due to odor and taste, of water found to contain more than trace amounts of the octane enhancer. None of the parties has offered any evidence of MTBE contamination at any level in the plaintiffs' water supply. As Kowalski himself points out, MTBE was not used in gasoline prior to the 1980s, and the plaintiffs do not allege the occurrence of a release from the Mobil pipeline subsequent to the one in 1968.

For the foregoing reasons, the Dusoes' claim for negligence will be dismissed.

**2. Trespass**

■ A trespass requires an unprivileged, intentional intrusion on land in the possession of another. *Wellesley Hills Realty Trust v. Mobil Oil Corp.*, 747 F.Supp. 93, 99 (D.Mass.1990), *citing New England Box Co. v. C & R Const. Co.*, 313 Mass. 696, 707, 49 N.E.2d 121 (1943). Because the plaintiffs have no evidence of any contamination in, on or at their property and thus have failed to show that any materials from the Mobil pipeline ever entered onto their property, their claim for trespass will be dismissed.

**3. Private Nuisance**

■ A private nuisance is a non-trespassory invasion of another's interest in

this Court assumes it refers to what the Roux Map identifies as the maximum projected

area and limits of potentially impacted groundwater.

the private use and enjoyment of land. *Doe v. New Bedford Housing Authority*, 417 Mass. 273, 288, 630 N.E.2d 248 (1994). The Dusoes cite *Lewis v. General Electric Co.*, 37 F.Supp.2d 55 (D.Mass.1999), for the proposition that a private nuisance action may proceed even though a plaintiff's property was not actually contaminated. *Lewis*, 37 F.Supp.2d at 61.

However, a subsequent Massachusetts Superior Court opinion harshly criticized the decision in *Lewis* as "inconsistent with Massachusetts law requiring plaintiffs to show proof of actual contamination to maintain a private nuisance claim." *Blackmore v. Massachusetts Turnpike Authority*, 2000 WL 420844, *3 (Mass.Super.2000), *citing Scavone v. Massachusetts Turnpike Authority*, 44 Mass.App.Ct. 1103, 688 N.E.2d 475 (1997) and *Garweth Corp. v. Boston Edison Co.*, 415 Mass. 303, 613 N.E.2d 92 (1993).

The *Lewis* decision appears to be clearly at odds with Massachusetts precedent and will not be followed by this Court. For the reasons described in the above section on negligence, the plaintiffs have failed to establish proof of actual contamination and their claim for private nuisance will be dismissed.

### 4. M.G.L. c. 21E, § 5

■ General Laws c. 21E, § 5(a)(iii) [a provision of the Massachusetts Oil and Hazardous Material Release Prevention Act], provides a property owner with a strict liability claim against certain classes of persons for 'damage to his real or personal property incurred or suffered as a result of [a] release or threat of release' of hazardous materials. *Guaranty–First Trust Co. v. Textron*, 416 Mass. 332, 334, 622 N.E.2d 597 (1993). According to *Garweth Corp.*, the Massachusetts Legislature did not intend to create a cause of action permitting recovery

for economic loss not directly resulting from environmental damage. *Garweth Corp.*, 415 Mass. at 307, 613 N.E.2d 92.

In *Scavone v. Massachusetts Turnpike Authority*, the Massachusetts Appeals Court affirmed the dismissal of three actions, based, in part, on Chapter 21E, because the plaintiffs could not demonstrate the presence of actual contamination of their property or their water supply. In so doing, that court affirmed the portion of the superior court's opinion holding that absent proof of (1) *actual contamination* of their property or water supply from the release of hazardous materials and the resultant damage to their property or (2) the incurring of response costs as a result of the *threat of release* of hazardous materials, the statutory claims under Chapter 21E were barred. *Scavone*, 1994 Mass.Super. LEXIS 102, *7–8 (1994). *See also Kempinski*, 2000 WL 420742, *3, 2000 Mass.Super. at *7.

The Dusoes have presented no evidence of actual contamination of their property, nor have they asserted that they have incurred any response costs as a result of any perceived future threat of release from the Mobil pipeline. Therefore, their claim under M.G.L. c. 21E will be dismissed.

### 5. Strict Liability for Ultra Hazardous Activity

■ In order to recover in strict liability for an ultra-hazardous or abnormally dangerous activity, the plaintiffs must demonstrate injury or harm resulting from the activity. *Clark–Aiken Co. v. Cromwell–Wright, Co., Inc.*, 367 Mass. 70, 89, 323 N.E.2d 876 (1975). As discussed above, the plaintiffs have failed to adduce evidence of property damage or personal injuries resulting from the 1968 spill. Therefore their claim for strict liability will be dismissed.

## 6. Negligent Infliction of Emotional Distress

■ The Massachusetts Supreme Judicial Court ("SJC") has expressed reticence regarding the potential for chimerical claims of emotional distress. In *Payton v. Abbott Labs.*, 386 Mass. 540, 437 N.E.2d 171 (1982), the SJC summarized its position as follows:

> We conclude that when recovery is sought for negligent, rather than intentional or reckless, infliction of emotional distress, evidence must be introduced that the plaintiff has suffered physical harm. This requirement...will serve to limit frivolous suits and those in which only bad manners or mere hurt feelings are involved, and will provide a reasonable safeguard against false claims. We see no reason for abandoning such limitations....We are unwilling, therefore, to impose upon the judicial system and potential defendants the burden of dealing with claims of damages for emotional distress that are trivial, evanescent, temporary, feigned, or imagined, in order to ensure that occasional claims of a more serious nature receive judicial resolution.

*Payton,* 386 Mass. at 555, 437 N.E.2d 171.

In *Urman v. South Boston Savings Bank,* 424 Mass. 165, 674 N.E.2d 1078 (1997), the SJC pointed out that, independent of the lack of any duty of care of the defendant savings bank in the circumstances of that action, the plaintiffs' negligent infliction of emotional distress claim failed because

> the record would not warrant a finding that the plaintiffs had been exposed to any [toxic waste] contamination or a finding that their alleged physical symptoms were causally related to...contamination, exposure, or any physical harm.

*Urman,* 424 Mass. at 171, 674 N.E.2d 1078. "In short, the plaintiffs in *Urman* failed to prove actual exposure" and thus dismissal of their claim for negligent infliction of emotional distress was warranted. *Cole v. D.J. Quirk, Inc.,* 2001 WL 705730, *3 (Mass.App.Div.2001).

In this case, there is insufficient evidence from which a reasonable jury could find that the plaintiffs were actually exposed to contaminated well water. The facts that Mrs. Dusoe suffers from a variety of physical and emotional symptoms and that Mobil is responsible for contamination of water wells elsewhere in the Joe Jenny Road neighborhood cannot establish proof of actual exposure, especially in light of the fact that *eleven* samples of the Dusoes' water well have resulted in "Non–Detects" for BTEX contaminants. Therefore, the claim for negligent infliction of emotional distress will be dismissed.

## 7. Intentional Infliction of Emotional Distress

■ In order to prove a claim for intentional infliction of emotional distress, a plaintiff must show that (1) the actor intended to inflict emotional distress or that he knew or should have known that emotional distress would result from his conduct, (2) that the conduct was extreme and outrageous beyond all bounds of decency and utterly intolerable in a civilized community, (3) that the defendant's conduct caused the plaintiff's distress, and (4) that the plaintiff's emotional distress was severe. *See Agis v. Howard Johnson Co.,* 371 Mass. 140, 144–145, 355 N.E.2d 315 (1976). Physical harm is not an essential element of a claim for intentional infliction of emotional distress. *See Nancy P. v. D'Amato,* 401 Mass. 516, 520, 517 N.E.2d 824 (1988). Nonetheless, "[t]he standard for making a claim of intentional infliction of emotional distress is very high." *Doyle v. Hasbro, Inc.,* 103 F.3d 186, 195 (1st Cir.1996).

In this case, there is no evidence that suggests that Mobil explicitly intended any of its actions to inflict emotional distress on the Dusoes. Additionally, it cannot reasonably be said that Mobil knew or should have known that the Dusoes' emotional distress would have resulted from its alleged negligent contamination of neighboring properties. The focus of cases "dealing with intentional infliction of emotional distress has been on the emotional distress of a person against whom the extreme and outrageous conduct was directed." *Nancy P.*, 401 Mass. at 520, 517 N.E.2d 824. In this case, Mobil's contamination of neighboring properties was not directed at the Dusoes.

■ Moreover, the record does not support the contention that Mobil's conduct was "extreme" and "outrageous beyond all bounds of decency and utterly intolerable in a civilized community". There is no evidence to support the Dusoes' assertions that Mobil knowingly contaminated the plaintiffs' water supply for a period of several decades or that it engaged in an "extensive cover-up" of its allegedly unlawful behavior. The fact that in May, 1996, when the DEP contacted Mobil's office of U.S. Supply and Logistics in Riverside, Rhode Island, the Mobil representative stated that he knew of no past releases, does not inevitably lead to the conclusion that Mobil was purposefully attempting to conceal its responsibility for the 1968 release. At the time of the release and for many years thereafter, the area was heavily wooded and unoccupied. Until the late 1980s, there were no private residences in the area and residential electric service was not available for use. Thus, it is consistent with the evidence in this case that the Mobil representative contacted in Rhode Island was unaware of the release at that time for purely innocent reasons.

Moreover, there is no evidence that Mobil did not perform all appropriate response actions in a timely fashion once testing of the neighborhood wells began in earnest in late 1996 and the DEP issued the N.O.R. to Mobil in 1997. Therefore, the Dusoes' claim for intentional infliction of emotional distress will be dismissed.

## ORDER

For the foregoing reasons,

(1) Mobil's Motion for Summary Judgment (Docket No. 19) is **ALLOWED,**

(2) Mobil's Motion to Strike Material Submitted in Plaintiffs' Opposition to its Motion for Summary Judgment (Docket No. 28) is **DENIED** and

(3) Mobil's Motion to Exclude Expert Testimony (Docket No. 14) is **DENIED as moot.**

**So ordered.**