Thomas P. LOUGHLIN,
et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

No. CIV.A.02–152(ESH).

United States District Court,
District of Columbia.

June 3, 2002.

Patrick Michael Regan, Washington, DC, for Plaintiffs.

Thomas M. Ray, U.S. Attorney's Office, Washington, DC, for U.S.

Mitchell E. Zamoff, Hogan & Hartson, L.L.P., Washington, DC, for American University.

Kirby D. Behre, Paul, Hastings, Janofsky & Walker, L.L.P., Washington, DC, for Glenbrook Ltd., Lawrence N. Brandt, Robert Brandt.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiffs have brought these personal injury cases,[1] alleging a variety of torts against defendants American University ("American" or "AU"), the United States of America, and Glenbrook Limited Partnership, Lawrence N. Brandt, Inc., Lawrence N. Brandt, and Robert Brandt (the "Glenbrook–Brandt Defendants"). The central claim of plaintiffs—the Loughlin family, Patricia Gillum, and Camille Saum—is that defendants negligently failed to warn them of the presence of munitions, highly toxic chemicals, and chemical warfare agents in the Spring Valley neighborhood in which they lived. AU has moved to dismiss all causes of action for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Its main argument

is that the University owed no legal duty to plaintiffs. Based upon consideration of the pleadings and the record, the Court finds that AU did owe a legal duty to plaintiffs, and that at least at this stage, plaintiffs' allegations are sufficient to withstand challenge. Defendant's motion in each of the three actions will therefore be denied. This Memorandum Opinion constitutes the Court's opinion as to American's motion to dismiss in all three cases.

## BACKGROUND

According to the complaints, in 1917, AU offered President Woodrow Wilson the use of its 92–acre campus in northwest Washington to support the war effort against Germany. The government accepted and established the American University Experiment Station ("AUES") on the property a short time later. By the end of the war, there were nearly 2,000 military and civilian personnel researching chemical warfare agents at AUES. Projects and field tests were conducted on the manufacture and use of gases, toxic munitions, grenades, incendiary devices, and flaming liquid weapons. This research included the use of highly toxic chemicals, including mustard gas, cyanide phosgene, arsenic, and lewisite. According to plaintiffs, AUES was the world's second largest poison gas production facility at the time. (Gillum Compl. ¶¶ 9–13; Loughlin Compl. ¶ 15.) On November 29, 1918, immediately after the war ended, the AUES drastically reduced its personnel and testing, and within one year, the station was closed. (Gillum Compl. ¶ 14.)

Plaintiffs allege that American knew that its property had been contaminated, but failed to remove the hazardous materials or to warn neighbors or future purchasers of the dangerous condition. For

---

**1.** The three actions are *Loughlin v. United States,* Civil No. 02–152; *Gillum v. The American University,* Civil No. 02–294; and *Saum v. The American University,* Civil No. 02–349.

example, plaintiffs assert that in 1917, AU approved the use of a rear portion of its property for a bomb pit. (Loughlin Compl. ¶ 16.) They contend that American pursued a claim against the Army for restoration of the grounds in 1919, but that the following year, AU accepted the Army's offer to construct eight buildings for the University instead of cleaning up the property that had been damaged by the chemical weapons testing. (Loughlin Compl. ¶¶ 17–18; Gillum Compl. ¶ 15.) Plaintiffs contend that at approximately the same time, American "published information stating that it gave permission to the Army to bury highly toxic munitions and other dangerous chemical materials on the American University property ...." (Loughlin Compl. ¶ 20.) In 1954, AU discovered buried munitions while building a television station and tower. (Gillum Compl. ¶ 17.) In 1986, American requested an Environmental Protection Agency analysis of the area, which indicated possible burial sites of munitions and gases. (Gillum Compl. ¶ 18.) The same year, an Army study concluded that "it can be inferred that laboratory quantities of toxic materials were disposed of on-site prior to or following the transfer of personnel and equipment ...." (Gillum Compl. ¶ 19.) AU then sought indemnification from the Army in the event that anyone was injured by the toxic chemicals or munitions that had been buried on the property. (Loughlin Compl. ¶ 26.)

Plaintiffs assert that numerous toxic materials were unearthed from the former site of the AUES beginning in the 1990s. In 1992, laboratory equipment and a closed 55–gallon drum were discovered while the Glenbrook–Brandt defendants, who had bought property from AU, were excavating near the future home of the Loughlins. (Loughlin Compl. ¶ 31.) In June 1996, landscapers unearthed laboratory glassware and broken bottles contaminated with arsenic and sulfuric acid on property adjacent to the Loughlins' land. (Id. ¶ 41.) In February 1999, the Army discovered a 75–mm projectile containing mustard gas buried only six inches deep in the yard next door to the Loughlins' home. (Id. ¶¶ 46, 49.) In 2001, hundreds of contaminated artillery shells and pieces of laboratory equipment were found within several feet of the Loughlins' property. (Id. ¶¶ 53–54.) Environmental studies conducted since the early 1990s have revealed dangerous levels of arsenic and other hazardous material. (Id. ¶¶ 39, 41, 47, 49–50; Saum Compl. ¶ 20.)

Plaintiffs were residents of this neighborhood in Spring Valley. Thomas and Kathi Loughlin are the parents of Nora and Hannah Loughlin, and they resided at 4825 Glenbrook Road from March 1994 to September 2000. The Loughlins purchased their home from the Glenbrook–Brandt defendants, which had in turn bought the property from AU. Both children were born while the Loughlins lived at 4825 Glenbrook. In 1997, Kathi Loughlin was diagnosed with a brain tumor. (Loughlin Compl. ¶ 44.) In 1999, the Loughlins were forced to relocate for several months to allow the Army Corps of Engineers to remove hazardous materials from two pits immediately adjacent to their property. (Id. ¶ 48–49.) The Loughlins had to move again later that year after high levels of arsenic were detected on their property. (Id. ¶ 50.) Patricia Gillum was the Loughlin's live-in nanny from July 1994 to April 1999. Gillum has been diagnosed with and treated for actinic keratosis, which is a possible indicator of arsenic exposure and future cancer. (Gillum Compl. ¶ 50.) Camille Saum was born in 1944, and lived at 5040 Sedgwick Street from 1947 to 1964. She has suffered from a variety of autoimmune and blood-related problems since her childhood, including pernicious anemia, renal stenosis, and actinic keratosis. (Saum Compl. ¶ 42.)

■ Plaintiffs contend that they were unaware of the Army's use of the property for the testing of chemical weapons during World War I, and that their health problems were caused by exposure to chemical agents on the former AUES site. The Loughlins have brought claims for negligence and failure to warn against AU, the Glenbrook–Brandt defendants, and the United States, and for fraud, deceit, and outrageous conduct against AU and the Glenbrook–Brandt defendants. Gillum's only remaining claim is for negligence against AU and the Glenbrook–Brandt defendants. Saum's sole outstanding claim is for negligence against AU.[2] This Opinion addresses only those claims that have been brought against AU.[3]

## LEGAL ANALYSIS

American has moved to dismiss the complaints against it for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Under Rule 12(b)(6), dismissal is appropriate only where a defendant has "show[n] 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *In re Swine Flu Immunization Products Liability Litigation*, 880 F.2d 1439, 1442 (D.C.Cir.1989) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1955)). The allegations in plaintiffs' complaints are presumed true for purposes of a 12(b)(6) motion, and all reasonable factual inferences should be construed in plaintiffs' favor. *Maljack Productions, Inc. v. MPAA*, 52 F.3d 373, 375 (D.C.Cir. 1995); *Phillips v. BOP*, 591 F.2d 966, 968 (D.C.Cir.1979).

## I. Negligence Claims

■ Negligence, like all of plaintiffs' claims against AU, is a question of state law. Under District of Columbia law, which is applicable in this case, "a person is liable to another only if '(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff.'" *Thomas v. City Lights School, Inc.*, 124 F.Supp.2d 707, 709 (D.D.C.2000) (quoting *Brown v. Consolidated Rail Corp.*, 717 A.2d 309, 311–12 (D.C.1998)). Defendant has moved to dismiss plaintiffs' negligence claims against AU (Gillum Compl., Count I; Saum Compl., Count I; Loughlin Compl., Counts II–III) on the ground that it owed no duty to plaintiffs. Its rationale is four-fold. First, defendant argues that plaintiffs' alleged injuries were not reasonably foreseeable to AU. Second, it contends that AU owed no duty as a vendor to plaintiffs, who were the subvendees or the guest of the subvendees of the property in question. Third, it asserts that the negligence claims cannot be based on a duty owed by AU either to its neighbors or to the general public. Fourth, it argues that the alleged knowledge of the Glenbrook–Brandt defendants, as the interceding owners, of the condition of the property extinguishes any duty that may have been owed by AU.

### A. Liability as Possessor of Land

■ Defendant attempts to characterize plaintiffs' cases as a vendor-subvendee dispute. This is an oversimplification. In fact, plaintiffs have alleged that AU has a

**2.** The claims against the United States of Gillum and Saum were dismissed without prejudice for failure to exhaust administrative remedies.

**3.** In their opposition, the Loughlin plaintiffs note that they intend to seek leave to amend the complaint to add a claim of civil conspiracy, which defendant argues would be futile. Because the Court is not permitted to issue advisory opinions on possible claims, it need not address the viability of a potential civil conspiracy claim. *Michigan v. Long*, 463 U.S. 1032, 1042, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

legal duty not only as the vendor of the Spring Valley properties that they purchased, but also as the owner of neighboring land. (*E.g.*, Loughlin Compl. ¶ 37; Gillum Compl. ¶ 45; Saum Compl. ¶ 36.) The Restatement (Second) of Torts § 364, which has been adopted in the District of Columbia, *Brown*, 717 A.2d at 316, sets forth a negligence standard for the creation or maintenance of dangerous or artificial conditions by a possessor of land.

> A possessor of land is subject to liability to others outside of the land for physical harm caused by a structure or other artificial conditions on the land, which the possessor realizes or should realize will involve an unreasonable risk of such harm, if ... (b) the condition is created by a third person with the possessor's consent or acquiescence while the land is in his possession, or (c) the condition is created by a third person without the possessor's consent or acquiescence, but reasonable care is not taken to make the condition safe after the possessor knows or should know of it.

Restatement (Second) of Torts § 364.[4] In *Brown*, the court found that section 364 potentially subjected the defendant to liability for a damaged bridge vent through which a metal plate fell, injuring a driver who was passing underneath. 717 A.2d at 316.

▇ Plaintiffs have pled facts to support a finding of negligence against AU under either section 364(b) or (c) for damage caused by the chemical agents—an artificial condition—that were buried on its land. Plaintiffs have alleged facts sufficient to indicate that American knew of the way in which the Army was using its land at the time, or alternatively, that AU failed to take reasonable care in making the con-

dition safe after it learned of the buried chemicals and munitions. Under the common law rule that "a landowner should be held to the duty of common prudence in maintaining his property in such a way as to prevent injury to his neighbor's property," *Brown*, 717 A.2d at 316 (citing *Dudley v. Meadowbrook, Inc.*, 166 A.2d 743, 744 (D.C.1961)), AU may be liable for negligence.

### B. Liability as Vendor

▇ Even under AU's transaction-based characterization of the action, however, plaintiffs' allegations are sufficient to withstand a motion to dismiss. The general rule, as set forth in section 352 of the Restatement (Second) of Torts, is that "a vendor of land is not subject to liability for physical harm caused to his vendee or others while upon the land after the vendee has taken possession by any dangerous condition, whether natural or artificial, which existed at the time that the vendee took possession." Section 353 of the Restatement, however, sets forth an exception to that principle.

> (1) A vendor of land who conceals or fails to disclose to his vendee any condition, whether natural or artificial, which involves unreasonable risk to persons on the land, is subject to liability to the vendee and others upon the land with the consent of the vendee or his subvendee for physical harm caused by the condition after the vendee has taken possession, if
>
> (a) the vendee does not know or have reason to know of the condition or the risk involved, and
>
> (b) the vendor knows or has reason to know of the condition, and realizes or

---

4. Section 364 was also included in the original Restatement of Torts, which was published in 1934, and was not materially modified in the Restatement (Second), which went into

effect at approximately the same time that Saum moved out of Spring Valley. This section therefore applies to all of the events in these cases.

should realize the risk involved, and has reason to believe that the vendee will not discover the condition or realize the risk.

(2) If the vendor actively conceals the condition, the liability stated in Subsection (1) continues until the vendee discovers it and has reasonable opportunity to take effective precautions against it. Otherwise the liability continues only until the vendee has had reasonable opportunity to discover the condition; and to take such precautions.

Restatement (Second) of Torts § 353.[5] Section 353 has been adopted in the District of Columbia in the context of a homebuilder and purchaser, see *Caporaletti v. A–F Corp.*, 137 F.Supp. 14, 17–19 (D.D.C. 1956), *rev'd on other grounds, A–F Corp. v. Caporaletti*, 240 F.2d 53 (D.C.Cir.1957), and in Maryland with regard to land transactions, *HRW Systems, Inc. v. Washington Gas Light Co.*, 823 F.Supp. 318, 351 (D.Md.1993) (citing *Council of Co–Owners Atlantis Condominium, Inc. v. Whiting–Turner Contracting Co.*, 308 Md. 18, 517 A.2d 336, 346 (1986)).[6]

Under section 353, a vendor's liability turns on both the vendee's knowledge of the dangerous condition and the vendor's own actions in concealing or merely failing to reveal the condition. Both of these elements are questions of fact—what did the Glenbrook–Brandt defendants know with regard to the buried munitions, and did AU actively conceal the existence of the chemicals on its land? *See HRW Systems*, 823 F.Supp. at 351 ("[T]he precise timing of the lifting of [the vendor's] duty to third parties must be calculated in relation to the knowingness of the seller's behavior. If the seller actively concealed the condition, then liability continues until actual discovery and a reasonable opportunity to take precautions against the hazard."). As in *HRW Systems*, "a determination of the knowledge of both plaintiffs and defendants is crucial, both as a threshold issue and in determining liability. Given the circumstances of this case ... this determination is one which the Court cannot make at this stage in the proceedings." *Id.*

### C. *Rosenblatt* and *Mobil*

In response, defendant contends that these cases should be governed by *325–343 E. 56th Street Corp. v. Mobil Oil Corp.*, 906 F.Supp. 669 (D.D.C.1995) [hereinafter *Mobil* ], and *Rosenblatt v. Exxon Co.*, 335 Md. 58, 642 A.2d 180 (1994). The courts in both of those cases held that the defendant property owners owed no duty to subsequent subvendees for damages suffered from dangerous conditions on the land, even though the defendants had allegedly contaminated the property themselves. *Mobil*, 906 F.Supp. at 681; *Rosenblatt*, 642 A.2d at 189.[7] Two factors compelled this conclusion. First, the courts found that there was "no relationship between the parties which would have made it foreseeable that an act or failure to act by [defendant] would result in harm to [plaintiff]." *Rosenblatt*, 642 A.2d at 189. Second, the courts were "unwilling to impose upon a

---

**5.** Like section 364, section 353 was in effect at all relevant times. While section 353(2) did not appear in the original Restatement, it was included in the Restatement (Second), which was published in 1965.

**6.** "[S]ince the District of Columbia derives its common law from Maryland, decisions of Maryland courts on points not determined by the Court of Appeals for the District of Columbia or by the Supreme Court [ ] are, if not completely controlling, nevertheless, of great weight ...." *Gerace v. Liberty Mutual Insurance Co.*, 264 F.Supp. 95, 97 (D.D.C.1966).

**7.** The *Mobil* court based its analysis almost entirely on *Rosenblatt*, and adopted the legal conclusions reached in that case. *Mobil*, 906 F.Supp. at 676.

lessee of commercial property a duty to remote successor lessees for losses resulting from a condition on the property that could have been discovered with reasonable diligence prior to occupancy and thus could have been avoided." *Id.*

Neither factor is present here. First, another judge in this District has already ruled that the risk of future harm to any subsequent occupant of AUES land was not only reasonably foreseeable, but "obvious." *Miller Cos. v. United States,* 963 F.Supp. 1231, 1243 (D.D.C.1997). Second, these cases involve residential property, not commercial real estate. While the common law doctrine of "caveat emptor" may apply to the sale of commercial property, *Mobil,* 906 F.Supp. at 678, neither *Rosenblatt* nor *Mobil* addressed its viability with regard to a purchaser of residential property. Rather, the courts noted that the doctrine was sensible in the context of "subsequent users who are able to avoid the harm completely by inspecting the property prior to purchasing/leasing it ...." *Id.* Unlike *Rosenblatt* and *Mobil,* however, in which the plaintiffs leased commercial land that they knew or should have known had previously been occupied by gas stations, the Court cannot say as a matter of law that the plaintiffs here—as well as the Glenbrook–Brandt defendants—would have been able to discover the defects in the property by inspection. The prior landowner was a university, not an oil company, and plaintiffs have alleged that the hazardous materials were not readily discoverable, because they had been buried in the ground. Thus, the rationale of *Rosenblatt* and *Mobil* cannot

be used to impose a burden of inspection on the plaintiffs in this case, who were buying residential property and had no reason to know of the prior use of AU's land.[8]

To the extent that *Rosenblatt* and *Mobil* are relevant, they both recognize a property owner's duty as a neighbor, which is similar to that embodied in section 364 of the Restatement. As the *Rosenblatt* court stated,

> When an owner or occupier of land engages in activities which are related to such ownership and occupation and which are abnormally dangerous in relation to the particular site, we place upon the actor the burden of bearing the risk of any harm to neighbors which arises from the activity, notwithstanding the absence of fault on the part of the actor. This burden is justified when weighing the rights of the actor, who benefits from the activity, against those of the occupants of the neighboring land, who do not benefit and have no way of avoiding the harm ... that may result from a dangerous activity on adjacent land.... [T]he occupier of land owes a duty to occupants of neighboring land to use care when conducting activities so as to avoid causing harm to the neighboring land.

642 A.2d at 188–89. *See also Mobil,* 906 F.Supp. at 679. Consequently, *Rosenblatt* and *Mobil* do not preclude the claims of plaintiffs as subvendees (or their guest); moreover, they support the proposition that a landowner owes a duty to its neighbors when it allows or engages in abnor-

---

**8.** In fact, the rule of caveat emptor has become increasingly disfavored. *Cf. T & E Industries, Inc. v. Safety Light Corp.,* 123 N.J. 371, 587 A.2d 1249, 1258 (1991); Prosser & Keeton on Torts § 64 (5th ed.1984). In *T & E Industries,* the court found that caveat emptor should not apply to a claim of strict liability "when a seller who has engaged in an abnor-

mally dangerous activity and disposed of the by-products of that activity onto the property markets the land. With knowledge of its activity and of its use of the land, the seller is in a better position to prevent future problems arising from its use of the property." 587 A.2d at 1258.

mally dangerous activities on its land. Thus, plaintiffs' negligence claims will not be dismissed, since it cannot be concluded that AU had no duty to the plaintiffs.

## II. Fraud, Deceit, and Misrepresentation Claims

 Having established that AU has a legal duty to those potentially harmed by the artificial condition on its land, the Court finds that the Loughlins' claims for deceit and misrepresentation (Count IV) and fraud (Count VI) are cognizable. The elements of a claim for fraud [9] are "(1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action taken by [plaintiff] in reliance upon the representation, (6) which consequently results in provable damages." *Railan v. Katyal*, 766 A.2d 998, 1009 (D.C. 2001). Fraud can arise from nondisclosure, but "mere silence does not constitute fraud unless there is a duty to speak." *Kapiloff v. Abington Plaza Corp.*, 59 A.2d 516, 517 (D.C.1948). Although defendant contends that it owed plaintiff no duty, the Court disagrees. The duty to disclose to neighbors or potential land purchasers dangerous conditions on one's own property is implicit in the duties elaborated in sections 353 and 364 of the Restatement. And each of the other elements of a claim for fraud has been alleged by the Loughlins. (*See* Loughlin Compl. ¶¶ 79–97; 118–35.) Defendant's motion to dismiss these counts is therefore denied.

## III. Outrageous Conduct Claim

 The Loughlins' final claim against AU is for intentional infliction of emotional distress. (Count V).[10] "In the District of Columbia, intentional infliction of emotional distress has three elements: '(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1305 (D.C.Cir.2002) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984)). Defendant challenges plaintiffs' claim under the first two prongs of this test.

 Under District of Columbia law, "[m]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not rise to the level of "extreme and outrageous" conduct. *Jung v. Jung*, 791 A.2d 46, 50 (D.C.2002) (citing *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C.1980)). Instead, intentional infliction of emotional distress occurs "only when the conduct goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community." *Id.* As to the second prong, "the tort of intentional infliction of emotional distress requires a high standard of intent, that is, the intent must be to actually cause emotional harm and it must be specifically directed toward the person complaining of the emotional harm." *Witherspoon v. Philip Morris Inc.*, 964 F.Supp. 455, 463 (D.D.C.1997).

In *Miller*, Judge Sporkin described the events alleged in the Loughlin complaint—the Army's practice of burying chemicals and contaminated weapons in Spring Valley.

> When it buried live munitions, the Army had in effect "booby-trapped" the land. The live munitions were buried so close to the surface that subsequent prepara-

---

**9.** The Court will construe plaintiff's deceit and misrepresentation claim as a cause of action for fraud.

**10.** Although this claim is styled as a cause of action for "outrageous conduct," the parties have construed it under the theory of intentional infliction of emotional distress. (Def. Mem. at 21; Loughlin Opp. at 34 n.8.)

tion of the land for development by the plaintiffs resulted in unearthing of the munitions. It had to be obvious to the Army when it embarked on its disposal project that any subsequent user of the land may well need to excavate below the surface for subsequent construction. It should have been recognized that such a reasonable use of the land obviously would have exposed the subsequent user to serious bodily harm or possibly even death if one of the unexploded munitions was discharged inadvertently.... No department of the government can so callously conduct itself, placing segments of the public in serious jeopardy, without appropriate warning of the hazards that exist.... The Army in this case created the hazard and literally "covered it up." ... Why the Army has resisted discharging its obligations demanded by the law and the public interest is inexplicable.

*Miller*, 963 F.Supp. at 1243. Under the court's characterization of the events at issue, the Army's actions were "utterly intolerable in a civilized community," *Jung*, 791 A.2d at 50, and therefore "extreme and outrageous." Moreover, Judge Sporkin found that the Army should have known that any subsequent user of the land—a specific individual—would be exposed to severe harm. Plaintiffs have alleged that AU was an active participant in this behavior. These allegations, against the backdrop of *Miller*, are sufficient at this stage to state a claim for intentional infliction of emotional distress.[11]

## CONCLUSION

For the aforementioned reasons, defendant American University's motion to dismiss is denied.

A separate order accompanies this opinion.

### *ORDER*

Upon consideration of defendant American University's motion to dismiss [13–1], plaintiffs' opposition, and the entire record therein, and for the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that defendant's motion is **DENIED.**

**SO ORDERED.**

### *ORDER*

Upon consideration of defendant American University's motion to dismiss [16–1], plaintiff's opposition, and the entire record therein, and for the reasons stated in the Memorandum Opinion in *Loughlin v.*

---

11. Defendant's contention that "intentional infliction of emotional distress claims fail where they are based on the alleged concealment of contamination in connection with a land sale and/or the damage to subsequent or neighboring property owners caused by contamination" (Def. Rep. at 26–27) is inaccurate, and the two cases it cites are inapposite. In *Dusoe v. Mobil Oil Corp.*, 167 F.Supp.2d 155 (D.Mass.2001), plaintiffs' intentional infliction of emotional distress claims were denied at summary judgment based on the evidence in the record, not at the motion to dismiss stage for failure to state a claim. *Id.* at 165–66. In *Haney v. Castle Meadows, Inc.*, 839 F.Supp. 753 (D.Colo.1993), plaintiff's claim that defendant failed to disclose that the property he purchased was partially contaminated was dismissed because there was "no evidence of reckless or actual exposure." *Id.* at 758. But the court specifically noted that "a party's actions in intentionally exposing another to hazardous substances can constitute outrageous conduct." *Id.* (citing *Field v. Philadelphia Elec. Co.*, 388 Pa.Super. 400, 565 A.2d 1170, 1182–83 (1989) (workers stated claim based on defendant's intentional venting of radioactive steam at them)). Plaintiffs have alleged that defendant's outrageous conduct in covering up the presence of buried munitions was intentionally and recklessly directed at subsequent landowners, which is sufficient to state a claim for intentional infliction of emotional distress.

*United States,* Civil No. 02–152, it is hereby

**ORDERED** that defendant's motion is **DENIED.**

**SO ORDERED.**

### *ORDER*

Upon consideration of defendant American University's motion to dismiss [9–1], plaintiff's opposition, and the entire record therein, and for the reasons stated in the Memorandum Opinion in *Loughlin v. United States,* Civil No. 02–152, it is hereby

**ORDERED** that defendant's motion is **DENIED.**

**SO ORDERED.**